UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

                                        File No. 1:98-CR-59

v.

                                        HON. ROBERT HOLMES BELL

JOSEPH BENJAMIN TAYLOR, III,

        Defendant.

_____ /


## O P I N I O N

This matter comes before the Court on Defendant Joseph Taylor's motion under 28

U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed upon him by this Court

on May 18, 1999.


### I.

On February 12, 1999, following a jury trial, Defendant was found guilty of the

following five counts: being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)),

possession with intent to distribute powder cocaine (18 U.S.C. § 841(a)(1)), possession with

intent to distribute crack cocaine (18 U.S.C. § 841(a)(1)), possession with intent to distribute

marijuana (18 U.S.C. § 841(a)(1)), and conspiracy to distribute crack cocaine (18 U.S.C.

§ 846).  On May 18, 1999, he was sentenced to the following terms, respectively: 120

months, 420 months, 420 months, 360 months, and 420 months in prison.  The Court also

assessed a fine of $10,000.00.

Defendant appealed his sentence.  In a published opinion issued April 24, 2001, the Sixth Circuit Court of Appeals affirmed the convictions.  *See United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001).  Defendant filed an application for writ of certiorari to the Supreme Court, which was denied on October 15, 2001.   Defendant timely filed the instant motion on October 15, 2002.

## II.

Defendant's grounds for relief all involve the propriety of a search and seizure of evidence from Defendant's apartment, which was the subject of a motion to suppress filed by Defendant.  The Court held a suppression hearing over a period of two days.  The relevant facts for the instant motion largely will be taken from the transcript of that hearing.

On March 31, 1998, at approximately 9:30 p.m., three members of the Kalamazoo Valley Enforcement Team (KVET) – Kalamazoo Police Officer Shannon Bagley and Kalamazoo Deputies Rodney Rought and James Sandlin – went to Defendant's apartment to investigate an intelligence report received from the Dowagiac Police Department.  The report indicated that Defendant was involved in the distribution of drugs in the Dowagiac area.  The report also stated that Defendant was involved in weapons with the Michigan Militia and was under investigation in a homicide.  (Hrg. Tr., docket # 78, at 3; Hrg Tr., docket #79, at 3-4.)

According to the testimony of Bagley and Rought at the suppression hearing, the three officers obtained entrance to the common area of the four-unit building by ringing the buzzer of another tenant.  The tenant pushed her buzzer to release the lock, admitting the officers

to the building.  After entering, the officers spoke to the resident, and she asked that her name not be mentioned to Defendant.  The officers went to Defendant's apartment door and knocked.  They testified that, in light of the facts alleged in the intelligence report, they were concerned about their safety and did not stand directly in front of the door of the apartment when they knocked.  The officers were dressed in civilian clothes, and their weapons were not visible.  (Docket #78, at 3-5; docket #79, at 5-7.)

According to the Bagley and Rought, a male voice responded from inside the apartment, asking who was at the door.  The officers identified themselves as police.  There followed a delay of two to three minutes, during which the officers heard the rustling sounds of more than one person.  One of the officers showed his police badge to the peephole.  After another short delay, the door was opened by a black male in his early twenties, who fit the general description the officers had of Defendant.  The individual identified himself as Clem Renaldo Hill, Defendant's brother.  Hill allowed the officers into the entry hall and subsequently acquiesced in their request to move to a larger area of the apartment.  No threats were made and the officers testified that, if the door had not opened, they would have departed.  (Docket #78, at 3-5; docket #6-9.)

Hill told the officers that he had been staying at Defendant's apartment for approximately two weeks, where he slept on the couch.  Hill also stated that Defendant lived at the residence but was not at home at the time.  (Docket #78, at 6-7; docket #79, at 9-10.) Officer Shannon Bagley moved a few feet from Hill to look inside an aquarium.  After he

3

turned around, he noticed a brownish-green plant stem on the coffee table. Based on his law enforcement experience, he recognized this as a marijuana stem. Bagley shined his flashlight on the stem to bring it to Deputy Rought's attention. Rought picked it up and then asked Hill if he used marijuana or other drugs and if there were drugs in the apartment. Hill responded that he did not know, but that he was not aware of any. (Docket #78, at 6; docket #79, at 9-12.) According to both Officers Bagley and Rought, Hill appeared unusually nervous and evasive during the entire conversation. (Docket #78, at 10; docket # 79, at 10-11.)

After seeing the stem, the officers asked Hill if they could search the remainder of the apartment. Hill refused. The officers then informed Hill that they would be securing the residence for a search warrant based on the intelligence report and the suspected marijuana stem they had found on the coffee table. Officers Bagley and Sandlin then conducted a quick search to determine whether any other persons were present who might pose a threat to their safety. Deputy Bagley found Defendant crouched and hiding in the bathtub. (Docket #78, at 7-10; docket #79, at 12-15.)

According to the officers, Defendant spontaneously stated that the officers "got [him]." Bagley led Defendant to the living room. He then looked in a large closet next to the bathroom to see if another person was present. Upon opening the door, he was overwhelmed by the smell of marijuana. Bagley observed in plain view an unzipped duffel bag containing numerous clear baggies with greenish-brownish plant material in them. Bagley did not seize the bag. However, he field tested the stem on the coffee table. When

it tested positive for marijuana, Bagley left the apartment to obtain a search warrant. (Docket #79, at 13-16.)

After returning with a warrant two hours later, Bagley read Defendant his *Miranda* rights and asked Defendant if he would speak with him. Defendant agreed. Defendant made statements saying that he was "small time," that he knew of "bigger people" and that he was comparatively the "worth of a penny." (Docket #79, at 17, 19-20.) The officers searching the apartment found a plastic ziplock baggie with over 750 grams of crack cocaine in the bathtub where Defendant had been hiding. (T. Tr. II, at 402, 434-38.) They also found a total of more than 10 kilograms of marijuana. (T. Tr. II, at 435-36, 438-40.) In addition, officers found underneath the corner of an ironing board a Taurus 9mm semi-automatic handgun with a laser sight pointed at the front door. (Docket #78, at 12.) Approximately $25,000.00 in cash was found hidden under a drawer in a bedroom cabinet. (Docket #78, at 13.) Officers also located a variety of drug paraphernalia in the apartment. (T. Tr. II, at 334-35.)

In contrast to the officer's testimony, Hill testified that the officers repeatedly pounded loudly on the door, strongly insisting on speaking with Hill, despite his repeated statements to them that Defendant was not home and that he, as a mere visitor, was not authorized to let them in. He told the officers that he wanted to call his grandmother. Defendant dialed the number, but his grandmother did not answer. (Docket # 78, at 50-51) On his brother's advice, he cracked the door and asked the officers if there was a problem. The officers told him that Defendant was reported to be selling drugs. Hill advised the officers that Defendant

was not present and told them he would have Defendant call the station when he returned.

Hill testified that the officers threatened him that, if he did not let them in, they would arrest

him for obstructing justice.  When Hill let the officers into the hallway, one of the officers

told Hill to go to the living room.  When he complied, they followed him.  (Docket #78, at

51-52.)  According to Hill, one of the officers asked what was in the fish tank, which was

empty.  The officer went over to the fish tank and put his hands inside, looking behind the

rocks and around the tank.  Another officer walked toward a green chair by the patio window

and took out his flashlight.  He turned the flashlight on and began looking on the coffee table,

knocking off clothes and eventually picking up an inch-long piece of stalk.  (Docket #78, at

52-53.)

The officer asked Hill if he smoked, and Hill denied it.  The officers asked to search

the apartment and Hill told them they could not, because it was not his apartment.  The

officers then directed him to sit down on the couch and they put handcuffs on him. (Docket

#78, at 54-55.)  Hill observed one officer enter the bathroom and discover Defendant in the

bathtub. Defendant was then brought into the living room, where he was placed on the couch

and handcuffed.  Neither Hill nor Defendant was searched.  (Docket #78, at 56-57.)  The

officer again asked to search the apartment and both Hill and Defendant refused.  The officer

left to get a search warrant and was gone for about two hours.  When he returned, three new

officers, two of whom were wearing masks, searched the apartment. (Docket #78, at 58-59.)

6

At the conclusion of the hearing, based on an assessment of the credibility of the witnesses, the Court concluded that the government had introduced competent evidence that they validly obtained entrance into the common area of the building. The Court rejected Defendant's claim that Hill was coerced and found by a preponderance of the evidence that Hill validly consented to admitting the officers into the apartment. The Court further concluded, based on Hill's application for Michigan residence on March 11, 1998 declaring Defendant's address as Hill's own, that Hill was not a temporary visitor and had authority to admit the officers. Moreover, Hill himself admitted that Defendant had directed him to open the door to speak with police. In sum, the Court concluded that the officers validly gained entry into the apartment. (Docket #135, at 35-36.)

Again, based on the credibility of the witnesses, the Court found that Hill had consented to the officers entering the living room and that he had authority to do so. The Court rejected Defendant's contention that the officers shifted items on the table to locate the marijuana stem and that the stem itself was not marijuana as defined under state law. The Court found by a preponderance of the evidence that the stem was in plain view and that the officers recognized the one-inch piece of stem as a marijuana stem based on their extensive narcotics experience. The Court therefore concluded that the authorities discovered a controlled substance or material directly related to a controlled substance in the living room of the apartment without a violation of Defendant's rights. (Docket #135, at 38-39.)

Based on the discovery of the marijuana stem and the investigative report they had received, the Court found that the officers constitutionally conducted a limited protective search of the property, irrespective of whether Hill had been taken into custody at the time. (Docket #135, at 40-41.)  As a consequence, the Court concluded that the officer's discovery of the duffel bag of marijuana and the one kilogram of cocaine discovered during the protective sweep was constitutionally proper.  (Docket #135, at 43.)  The Court therefore found that the warrant, which was based in part on the discovered drugs, was valid and the evidence discovered through the search conducted pursuant to warrant was admissible. (Docket #135, at 43-44.)  At the end of its determinations, the Court made specific findings that the officers were fully credible and that Hill's testimony could not be believed.  (Docket #135, at 44-45.)

On appeal, Defendant challenged various aspects of the Court's determination on the motion to suppress.  The Sixth Circuit rejected Defendant's claim that the officers violated his Fourth Amendment rights when they entered the common area of the building, finding that the district court had properly found that the officers gained entry at the invitation of another tenant.  *Taylor*, 248 F.3d at 512.  The court also held that the district court had properly found the discovery of the marijuana stem was within the plain view exception to the warrant requirement.  *Id.*  Together with the investigation report they possessed and Hill's overtly nervous behavior provided probable cause to obtain a warrant.  As a result, the protective sweep of the premises was proper in order to secure the premises while the

8

officers awaited a warrant.  *Id.* at 513.  Moreover, the court held that, because the officers had probable cause to obtain a warrant before conducting the protective sweep, the search pursuant to the warrant would inevitably have led to the discovery of Taylor and the other quantities of drugs located during the protective sweep.  The evidence therefore was admissible under the alternative "inevitable discovery doctrine."  *Id.* at 514 (citing *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (discussing doctrine)).  The Sixth Circuit also rejected Defendant's challenge to the sufficiency of the evidence on the conspiracy charge and his challenges to the application of the Sentencing Guidelines.  *Id.*  at 515-16.

## III.

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack.  28 U.S.C. § 2255.  To prevail under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict."  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  "Relief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).

9

In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152, 166 (1982). A petitioner is procedurally barred from raising claims in a § 2255 motion, even those of constitutional magnitude, to which no contemporaneous objection was made or which were not presented on direct appeal. *Frady*, 456 U.S. at 167-68; *Nagi v. United States*, 90 F.3d 130, 134 (6th Cir. 1996). Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a motion under § 2255 only if the defendant first demonstrates either cause for the default and actual prejudice or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998). The procedural default rule does not apply, however, to claims of ineffective assistance of counsel. Claims of ineffective assistance of trial counsel generally are not reviewable on direct appeal, because the record may be inadequate to permit review. *See United States v. Kincaide*, 145 F.3d 771, 785 (6th Cir. 1998); *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir. 1996). Consequently, such claims may be raised for the first time in a § 2255 proceeding, without regard to a failure to raise them on direct appeal. *See Tucker*, 90 F.3d at 1143; *United States v. Allison*, 59 F.3d 43, 47 (6th Cir. 1995).

In an action to vacate or correct the sentence, a court is required to grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ." 28 U.S.C. § 2255.

> The statute "does not require a full blown evidentiary hearing in every instance . . . . Rather, the hearing conducted by the court, if any, must be tailored to the specific needs of the case, with due regard for the origin and complexity of the issues of fact and the thoroughness of the record on which (or perhaps, against which) the section 2255 motion is made."

*Smith v. United States*, 348 F.3d 545, 550-51 (6th Cir. 2003) (quoting *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993)).  No evidentiary hearing is required if the petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (quoted in *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).  Where the judge considering the § 2255 motion also conducted the trial, the judge may rely on his or her recollections of the trial. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996).

## IV.

The files and records in this case conclusively show that Defendant is not entitled to relief on his motion.  In his 80-page motion and his 41-page brief in support, Defendant makes seventeen challenges to the effectiveness of trial and appellate counsel.  Those challenges, however, do not constitute seventeen independent grounds for relief, but rather can be grouped into a set of three grounds for relief with a number of subparts: (a) ineffective assistance of trial counsel at the suppression hearing; (b) ineffective assistance of trial counsel during jury selection; and (c) ineffective assistance of appellate counsel in failing to

raise the issue of consent and failing to timely notify Defendant that his appeal had been denied.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if he was not prejudiced by counsel's error. *Id.* at 691. To establish prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

12

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. To determine if the defendant was prejudiced by his attorney's performance, it is necessary to determine if the proceeding was fundamentally unfair or unreliable; a court should not focus the analysis solely on the outcome. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

When deciding a claim of ineffective assistance of counsel, a court "need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

A.   Ineffective Assistance at Suppression Hearing

In his motion, Defendant makes numerous assertions of attorney error at the suppression hearing, which he contends constitute ineffective assistance of counsel, both individually and collectively. Specifically, Defendant asserts that counsel (1) failed effectively to challenge the issue of consent; (2) failed to obtain a police report and to use it effectively on cross-examination; (3) failed to probe the bias and dishonesty of the officers regarding a previous incident; (4) refused to allow Defendant to testify at the hearing; (5) failed to obtain the appearance of a witness at the hearing; (6) failed to file a motion for reconsideration of the order to suppress based on new evidence; (7) failed to raise a Fourth

Amendment issue regarding the plain-view seizure of the marijuana stem; and (8) failed to

obtain evidence of the marijuana stem for use at the suppression hearing.

### 1.    Consent

Defendant argues that counsel was grossly ineffective in the manner in which he

raised and developed Defendant's claim that Hill did not validly consent to allowing the

officers to enter the apartment.  Defendant contends that counsel failed adequately to develop

the full circumstances of the coercion exercised upon Hill by the officers' repeated and

prolonged knocking and requests to speak with Hill.  He also asserts that counsel overlooked

28 allegedly significant aspects of the factual circumstances.

Defendant's claim is meritless.  The "28 circumstances" he recites are nothing more

nor less than a wordy reconstruction of the facts into discrete characterizations with no

factual or legal relevance.  For example, he argues that counsel failed to emphasize the

following: "how the physical setting went from respectably controlled and nonexploitable,

to coercive and intimidating"; "the relevancy of the safeguards attached to the building –

including the two-way window attached to the security door that allowed officers to safely

observe the door of each of the 4 residents from outside the locked security door and

provided a safe outward view for the petitioner's unit in particular – in vitiating the officers'

arrogated 'fear of the unknown'"; "the officers' immediate awareness of the uniqueness of the

petitioner's individual condo unit, among the other 3 residents' units, in not having a front

window within the unit itself to notice or observe persons buzzing or speaking from the

safeguards at the security door, when they arrived on the premises. . . ."  Most of the recited "circumstances" were drawn from the record and formed part of the evidence before the Court in reaching its decision.  Defendant's real objection appears to be the weight given those circumstances by counsel, whether by way of argument or cross-examination. Defendant also argues that counsel failed to bolster Hill's credibility concerning the coercive tactics of the officers by locating and using Defendant's telephone records to determine whether Hill had in fact called his grandmother.

The Court has reviewed each of Defendant's allegations.  None of the circumstances alleged by Defendant supports a conclusion that counsel's representation was in any way inadequate, much less overcomes the presumption that counsel's performance fell within the wide range of professional assistance.  *Strickland*, 466 U.S. at 690.  Counsel developed the critical facts and carefully cross-examined law enforcement officers regarding their testimony.  The alleged 28 circumstances were either part of the record before the Court or tangential to the issues to be decided.  Similarly, the telephone records were relevant only to a collateral issue.  Even if those records would have shown a call to Defendant's grandmother, the evidence would not have corroborated Hill's testimony in any material fashion.  Counsel clearly was not ineffective for declining to focus on collateral issues.

### 2.    Use of police report

Defendant argues that counsel was ineffective for failing to obtain prior to the hearing a copy of the police report written by the officer who spoke to Hill through the door, Deputy

Rought.  The basis for Defendant's assertion that counsel did not have the report is counsel's question to Rought during cross-examination as to whether Rought had a police report and whether counsel could view it.  After a quick review, counsel returned the report to Rought and continued questioning him.  Defendant asserts that, had counsel obtained the report prior to the hearing, he would have been able to use the report to support Hill's claim that Rought was intimidating and aggressive and coerced Hill into opening the door.

Defendant's claim is unsupported by the record.  First, his conclusion that counsel's question revealed that he had not previously seen the report is highly speculative.  It is as likely that counsel's brief in-court review of the report was to ensure that the report was the same as the one counsel possessed.   In any event, even if counsel did not have the report before the hearing, nothing about the report supports Defendant's claim.  Rought's report recites the identical circumstances to which Rought testified at the hearing and the report was fully supportive of the officers' version of the events.  (Docket # 145: Def. App.  PP.) Accordingly, the failure to obtain the record in advance of the hearing could have had no effect on the outcome.

### 3.    Bias

Defendant next suggests that counsel failed to investigate the origin of the intelligence report.  He asserts that the report did not result from the work of the Dowagiac City Police Department, but instead was the product of KVET investigation, during which officers had attempted to gain entrance to another residence at which Defendant was present by

16

persistently asking to enter.  Defendant allegedly rebuffed the officers, stating that the occupants "didn't trust the police and that they were scared of police due to the police brutality cases involving the Rodney King and Malice Green incidents."  On that occasion, the KVET officers left the premises.  Defendant alleges that the officers subsequently examined the license plate of Defendant's car, which was parked outside, and used his license plate number to provide Dowagiac police with Defendant's current address.  Defendant suggests that the tactics used by officers in attempting to gain entrance to the other residence supports a conclusion that KVET routinely used such tactics.  He further argues that KVET officers were biased against Defendant both because of his rebuff of their requests for entry and because of his prior 1996 drug offense.

Defendant's argument is patently frivolous.  Contrary to Defendant's convoluted reasoning, the incident fails to demonstrate police bias.  Indeed, the failed prior attempt of KVET officers to obtain entry to an apartment demonstrates that the officers accepted the occupants' refusal to admit them and they left the premises.  Reasonable counsel unquestionably would hesitate, as a matter of strategy, to investigate a wholly tangential incident of no clear benefit but some risk to Defendant.  Defendant therefore demonstrates no attorney error.

### 4.    Right to testify

Defendant next argues that his attorney refused to allow him to testify at the suppression hearing.  Defendant claims that, after Hill testified, Defendant told counsel both

verbally and through notes that he wanted to testify so that Hill's testimony would not ruin his case.  He asserts that the decision not to have Defendant testify lacked a strategic reason and was extremely prejudicial in light of Hill's lack of credibility in being unable to identify the last name of the person he stated was his best friend or the name of that friend's girlfriend.   He further alleges that his testimony was essential to fully develop the issue of whether Hill validly consented to the officers' entry into the apartment.

Defendant's claim is not credible.  As the government points out, Defendant received a two-point enhancement to his offense level at sentencing on the grounds that Defendant had suborned perjury by permitting Hill to provide patently false testimony at the suppression hearing. (Docket #133: Sent. Tr., at 63-64.)  The Court further found that Defendant had obstructed justice by lying at trial, claiming that he was unaware of the drugs in the bathtub of his own apartment, even though he was in that tub while hiding from police.  (Docket #133: Sent. Tr., at 64.)  Despite the Court's finding that Defendant had suborned perjury at the suppression hearing, when Defendant had the opportunity for allocution at his sentencing, he did not claim that counsel refused to allow him to testify to contradict Hill.  Instead, he told the Court that counsel had advised him not to testify, an entirely different allegation. (Docket #133: Sent. Tr., at 67.)  That allegation also is consistent with the bulk of the argument presented by Defendant in his motion to alter or amend sentence, which focuses on the reasonableness of counsel's advice, not on the deprivation of his right to testify. Further, although he filed a reply brief, Defendant has not disputed the government's reliance

18

on the Court's determinations at sentencing.  For all these reasons, and in the face of the clear record, the Court concludes that Defendant's factual allegation that counsel refused to allow him to testify is not credible.  *See Arredondo*, 178 F.3d at 782 (in § 2255 proceeding, court is not required to accept as true allegations that are contradicted by the record, are inherently incredible or are conclusions rather than statements of fact.)

With respect to Defendant's suggestion that counsel gave poor advice in advising Defendant not to testify, the Court finds no error of constitutional dimension.  Although Defendant's testimony at the suppression hearing could not have been used against him over his objection, *see Simmons v. United States*, 390 U.S. 377, 394 (1968), strategy nevertheless reasonably could lead counsel to advise Defendant not to testify.  First, having Defendant testify against his own witness ran the risk that the Court would view Defendant's testimony as merely reinforcing the conclusion that Hill was lying, thereby further undermining rather than rehabilitating Defendant's claim.  Second, by testifying at the suppression hearing concerning the events leading up to the search Defendant would provide the prosecution with precise information about Defendant's case at trial.  Both reasons constitute valid legal strategy.

As the Court previously noted, Defendant bears the burden of overcoming the presumption that counsel's actions might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689; *Michel*, 350 U.S. at 101; *Nagi*, 90 F.3d at 135.  In light of the circumstances as they existed at the time of counsel's actions, Defendant has failed to demonstrate that "the

19

identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Finally, even were the Court to conclude that counsel's advice was erroneous, Defendant nevertheless would fail to demonstrate the error amounted to constitutionally ineffective assistance because Defendant cannot demonstrate the necessary prejudice. *Id.* Defendant testified at trial concerning the officers' conduct in entering the apartment. Defendant expressly testified that the officers engaged in coercive behavior, refusing to leave when Hill did not open the door. He testified that he heard the officers threaten to charge Hill with obstruction of justice if he did not open the door. In addition, Defendant testified that he was just hiding because he did not want the police to see him in the apartment and had no idea that there was cocaine in the bathtub with him while he was hiding. (Docket #131, at 582-88.) On the basis of Defendant's patently incredible trial testimony, the Court concluded at sentencing that Defendant had obstructed justice by testifying falsely. (Docket #133, Sent. Tr., at 64.) Given the Court's complete rejection of Defendant's trial testimony as false, no basis exists for concluding that the Court would have found the same testimony to be credible at the suppression hearing.

### 5.    Witness

Defendant next argues that counsel was ineffective for failing to interview the other residents of the building to determine whether the officers had testified truthfully about a resident of another apartment letting them into the building. Defendant asserts that, while

20

the resident purportedly asked the officers not to reveal her identity, only four tenants resided in the building and only one of the two occupying an apartment above Defendant's apartment was female. Defendant suggests that, had counsel investigated, he would easily have discovered whether the resident in fact admitted the officers or whether they obtained entry by other means.

Defendant's suggestion that he was prejudiced by counsel's failure to investigate is wholly unsupported. Defendant does not argue that any evidence exists that would suggest that the officers were not lawfully admitted as they testified. Instead, he asks the Court to find he was prejudiced by counsel's failure to produce testimony corroborating the officers. He suggests only that a contrary witness might have been found. He further speculates that such a witness would have led the Court to conclude that the officers lied about their entry into the building and therefore further conclude that the officers lied about all of the circumstances leading to Hill's consent to let the officers into the apartment.

Defendant's argument relies on a complex web of assumptions and speculation lacking any support. Defendant has failed entirely to demonstrate that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. He therefore has failed to demonstrate the necessary prejudice to prove his claim. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

### 6.      Motion for reconsideration

Defendant next contends that counsel was ineffective in failing to move for a new trial based on seven facts revealed by the officers at trial: (1) Rought admitted "demanding" that the upstairs resident admit the officers through the security door; (2) the fact that the officers rang the bell at night necessarily increased the resident's fear and was inherently coercive; (3) the officers acknowledged regularly using the method of ringing another resident's buzzer to obtain entry into the common areas of buildings; (4) both Bagley and Rought acknowledged that they began knocking on a hollow metal door in an manner that would induce a resident to respond; (5) the officers acknowledged that they intentionally employed such tactics to control encounters with citizens at their homes when the officers did not have a warrant; (6) Rought raised his badge to the peephole in Defendant's door a total of four times, in order to assert his authority while hiding himself from view; and (7) the officers acknowledged that Hill had told them he did not know when Defendant would return.

The Court has reviewed each of the alleged "new" facts revealed in the trial testimony and finds none would lead a reasonable court to grant a new trial on the facts of the instant case.  The jury was fully capable of assessing the cited facts in evaluating the officers' credibility concerning the events as they transpired.  The jury rejected Defendant's version of the facts and counsel reasonably determined that a motion for new trial would be futile.

### 7.    Plain-view

Defendant argues that counsel rendered ineffective assistance by failing effectively to challenge the officers' recognition of a small piece of vegetative stem as a marijuana stem. Defendant argues that counsel should have retained an expert witness to testify that the officers' claims of recognition were not credible.  Because the finding of the marijuana stem in plain view was critical to both the legality of the protective search and the issuance of the warrant, the failure to obtain an expert, Defendant argues, was both unreasonable and prejudicial.

Defendant has failed to demonstrate that counsel's decision not to seek an expert on an experienced officer's ability to recognize a marijuana stem was "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Counsel elected instead to rely upon cross-examination and argument challenging the officers credibility rather than seeking conflicting testimony.  Counsel focused on the existence of other plants in the house and the small size of the sample, casting doubt on the credibility of the officers' assertions.  That decision was rational.

Further, while counsel partially mischaracterized Hill's testimony in arguing that the officers had moved papers and other items on the table in order to find the stem, he did not err in stating the gist of Hill's evidence – that the officers had moved items on the table, even

if the items Hill alleged they moved were clothes rather than papers.[1]   Contrary to Defendant's assertions, counsel's misstatement does not rise to the level of ineffective representation.

Finally, Defendant complains that counsel was ineffective in arguing that, because the marijuana stem was not illegal to possess under Michigan law, it is not relevant to a determination of probable cause. However, although the Court rejected counsel's argument and found facts against Defendant, it expressly found that counsel's motion to suppress was reasonably brought and raised significant issues. Moreover, the Sixth Circuit did not dismiss the theory as frivolous, but carefully addressed the argument. Taken together, Defendant fails to show that counsel's performance fell below the wide range of competent representation. *Strickland*, 466 U.S. at 689-90.

## 8.    Evidence of marijuana stem

In his final claim of attorney error at the suppression hearing, Defendant contends that counsel erred in failing to obtain photographic evidence of the stem as it appeared at the scene for use in the hearing. Defendant suggests that this failure prevented counsel from accurately challenging the method by which the officers viewed and identified the stem as being from a marijuana plant. He also suggests that the photographs would have

---

[1]Both Officer Rought and Officer Bagley testified that the coffee table was covered with miscellaneous papers, though they denied moving anything. (Docket #78, at 21; docket #79, at 11, 33.) Hill, however, mentioned that officers knocked clothes off the table before finding the marijuana stalk (docket #78, at 53). Apparently, counsel confused the statements about the items located on the table.

demonstrated the low lighting of the apartment area and the placement of the coffee table relative to the fish tank.

Defendant's claim that counsel was ineffective for failing to obtain photographs for use at the suppression hearing is frivolous.  Officer Rought admitted in his testimony that the lighting in the apartment was dim.  (Docket #78, at 5.)  A photograph of the room would have added little or nothing to the evidence.  Further, any picture of the marijuana stem was, by all accounts, a picture taken after it had been moved and the apartment searched. Photographs subsequently taken would have added little or nothing toward the resolution of the issues in dispute at the hearing.  Accordingly, Defendant fails to demonstrate that counsel's representation was constitutionally deficient for failing to obtain photographs.

## 9.    Cumulative Error

Defendant asserts that, even if trial counsel's errors did not separately rise to the level of ineffective assistance of counsel, they collectively were sufficiently egregious as to deprive him of the effective assistance of counsel.  Inasmuch as the Court has considered each of Defendant's claims and found no attorney error and no prejudice, the claims, even when considered together, do not establish the ineffective assistance of counsel.

## B.    Ineffective Assistance During Jury Selection

Defendant contends that trial counsel was ineffective for failing to timely object to the prosecution's peremptory challenge to a female African American juror. In *Batson v. Kentucky*, 476 U.S. 79, 96, (1986), the Supreme Court articulated a three-step analysis to be

25

applied to an Equal Protection Clause claim that purposeful discrimination occurred in the selection of the petit jury based solely on the prosecutor's exercise of his peremptory challenges at trial. *See also Miller-El v. Dretke,* 125 S. Ct. 2317 (2005); *United States v. Bartholomew,* 310 F.3d 912, 919 (6th Cir. 2002). First, the Defendant must establish a prima facie case of racial discrimination. *See United States v. Copeland,* 321 F.3d 582, 599 (6th Cir. 2003). This requires an initial showing that "the defendant . . . is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson,* 476 U.S. at 96 (citation omitted). "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Id.* (quoting *Avery v. Georgia,* 345 U.S. 559, 562 (1953)). Ultimately, the Defendant, relying on this presumption and other facts, must "raise an inference that the prosecutor used [the practice of peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.*

Second, once the Defendant has raised the necessary inference, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors." *Id.* at 97. "The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral." *Copeland,* 321 F.3d at 599. More specifically, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible. 'At this . . . step

of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

Third, the party opposing the strike must demonstrate that the prosecutor's purported explanation is merely a pretext for racial motivation.  *See McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001) (describing *Batson* test).  Ultimately, the court must determine "whether the defendant has carried his burden of proving purposeful discrimination."  *Hernandez*, 500 U.S. at 359.  In making this determination, the Court presumes that the facially valid reasons proffered by the prosecution are true.  *Id.* at 359-60. Racially discriminatory purpose or intent must be affirmatively shown by the opponent of the strike.  *Id.* at 360.  The ultimate burden of persuasion always remains with the opponent of the strike.  *See United States v. McFerron*, 163 F.3d 952, 955 (6th Cir. 1998).

Notwithstanding this three-part test, however, the Supreme Court has held that the question of whether a prima facie case has been established becomes moot once a court rules on the ultimate question under *Batson* of whether there was purposeful discrimination. *Hernandez*, 500 U.S. at 360; *Lancaster v. Adams*, 324 F.3d 423, 432-33 (6th Cir. 2003). "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary

issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359; *Lancaster*, 324 F.3d at 433.

In the instant case, prior to jury selection, the Court informed Defendant that any challenges based on *Batson* must be brought to the Court's attention at the end of the exercise of peremptory challenges but before the jury was seated. (T. Tr. I, at 4; docket #129.) In the middle of jury selection, the prosecutor informed the Court and the Defendant that he was likely to challenge an African-American juror, to which he anticipated Defendant might raise a *Batson* challenge. He requested that the challenge be conducted at side-bar. (T. Tr. I, at 99.) The prosecutor at that juncture offered the following explanation at sidebar:

> When I get the questionnaires – and I got them last Friday – I go through all the questionnaires and I highlight information that concerns me and I give an initial grade. With Ms. Mariner, she's in her twenties, and just about all the jurors in their twenties I gave D minuses to – I don't want young jurors; that is a prerogative of ours – and she's not married. I was looking for jurors of the community, married and not young, and those are the reasons that I'm challenging her for what I highlighted last Friday and I did with all the younger ones, so that would be the reason I would peremptorily challenge her.

(T. Tr. I, at 99-100.) After the jury venire had been excused from the courtroom, the prosecutor reiterated his intention to excuse the juror. Defendant entered a *Batson* objection, noting that few minorities were present in the jury panel and expressing skepticism regarding the validity of the prosecutor's proffered reason. (T. Tr. I, at 103.) The prosecutor placed his reasons for exercising the challenge on the record, substantially expanding the basis:

> As we said in side-bar and I would like to state for the record, I have all the jury questionnaires here, and last Friday I went through all the questionnaires with a highlighter and I – when I anticipate selecting a jury, I highlight

28

information that's pro, con, of interest to the prosecutor in selecting a jury. I also give an initial letter grade from A to F of the jurors.

Going through Ms. Mariner's questionnaire, I did not know that she was African-American and I gave her – the information I highlighted was that she was 29, that she was not married, didn't have children, and the comment I put on her questionnaire was "too young." I also have the same remarks – and gave her a D minus and gave that same letter grade and remarks to other jurors in the venire.

Also, Your Honor, whether Ms. Mariner was African-American or white, male or female, I would still challenge her on a racially neutral reason, and that is because it's been my perception as we've gone through this two hours of jury selection she has had sort of a flat affect, staring forward, when all other jurors are very involved. They're looking to the court when you are instructing them in the case, it's my perception and my feeling and my experience, than jury number 60, and for those reasons – we are not challenging Ms. Mariner because she's African-American just for these racially neutral reasons.

(T. Tr. I, 104-05.) The Court concluded that, at that point in the jury selection, the prosecutor had articulated a legitimate, non-discriminatory reason. The Court, however, observed that it remained possible for the subsequent juror selections to demonstrate a pattern suggesting that the proffered reason was pretextual. The Court therefore denied Defendant's *Batson* challenge at that juncture, but left open Defendant's right to renew the objection later in the jury selection process. (T. Tr. I, 105-06.)

Following the exercise of all challenges, the Court inquired with the attorneys as to their satisfaction with the jury. Counsel for Defendant stated that he was satisfied, and the jury was sworn. (T. Tr. I, 151-52.) The Court gave preliminary instructions to the jurors and excused them for lunch. (T. Tr. I, 151-56.) The Court then inquired of the attorneys

29

if there were additional matters to be addressed before the trial began.  At this time,

Defendant's attorney renewed his *Batson* challenge, arguing that, while the prosecutor had

claimed to excuse juror Mariner on the grounds of her youth, he had allowed other young

Caucasian jurors to remain on the jury, two of whom were 23 years old and single, and one

of whom was 33 years old and married.

> The prosecutor responded to the objection as follows:
>
> To respond, there are two witnesses (sic) left in the panel that are both age 23.  That's juror number 53 and juror number 83.  I was under the mistaken impression that juror number 53, that is Ms.  Karson sitting in seat 13, I thought she was going to be an alternate juror.  I thought that's how we selected the jury, so that's my fault.  I have D minuses and "too young" written on both those jury questionnaires that I filled out last Friday.  I ran out of peremptory challenges.
>
> I would have – I did challenge Mr.  Raynor, juror number 73, who was in his twenties.  Also on his questionnaire I had concerns because he was too young, and juror number 42, the government considered excusing him, Mr. Gillengerten, but the defense beat us to that and the defense peremptorily challenged him, who was in his twenties.
>
> So, Your Honor, I know jury selection is a mystic art, not a science, and we made the best use of the peremptory challenges we had, and we did not exercise any challenge for racial reasons.

(T.  Tr.  I, at 157-58.)

In considering the objection, the Court first concluded that, as it had instructed the

attorneys prior to jury selection, the *Batson* challenge was not timely because the jury had

already been seated.  Nevertheless, the Court considered the challenge on the merits, as if it

had been timely filed:

However, even were this objection to be timely, I note that Ms. Mariner was the fifth peremptory challenge exercised by the government. They only had one peremptory challenge left. That was exercised with respect to Elliott Singer, juror number 80. It is true that there were other young members of the panel that could have been excused rather than Mr. Singer. Ms. Starkweather was the juror called to the box to replace Ms. Mariner, and Ms. Karson was in the jury box throughout the proceedings. I don't find, from having observed this process, that the remaining panel thus demonstrates that the excuse used to excuse Mr. Mariner was exercised on a prohibited basis under <u>Batson</u> even if this challenge was raised on a timely basis.

(T. Tr. I, 158-59.)

As a result, regardless of whether counsel's performance in failing to renew his objection before the jury was seated was "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, the Court considered and addressed the challenge on the merits notwithstanding the failure to object. Accordingly, the defendant is not entitled to relief because he was not prejudiced by counsel's error. *Id.* at 691.

C.    Ineffective Assistance of Appellate Counsel

Defendant next claims that appellate counsel was ineffective. As the basis for his claim, Defendant asserts that appellate counsel was retained only after counsel agreed to raise on appeal two of Defendant's specific arguments regarding the search and seizure of the evidence found at his apartment. Specifically, Defendant wished counsel to raise a due process challenge to the validity of the unnamed resident's consent to admit the officers into the building and Hill's consent to admit them to the apartment. He also wished to challenge the credibility of the officers' identification of the marijuana stem by merely seeing a one-inch piece of vegetative stem. Counsel did not raise the two issues in his appellate brief.

31

Defendant was granted permission to file a *pro se* supplemental brief in the Sixth Circuit, which he did on January 27, 2000.  In his supplemental brief, Defendant raised three issues: (1) he was deprived of due process because consent to enter the apartment building was the result of the officers' undue influence; (2) the one-half inch plant stem did not constitute probable cause to support arrest or a protective search; and (3) the protective search was a subterfuge to gather additional evidence.

The Sixth Circuit directly addressed Defendant's claim that the officers violated his Fourth Amendment rights when they entered the common areas of the building.  Although the court did not discuss Defendant's particularized contention that the resident must have been coerced by police authority, the court flatly rejected Defendant's argument that the Fourth Amendment is violated when police ring a security buzzer and a resident admits them in acquiescence to their apparent authority.  *Taylor*, 248 F.3d at 511-12.  The remaining arguments were not addressed by the Sixth Circuit.

Defendant's claim that appellate counsel rendered ineffective assistance is without merit.  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the

32

wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2002). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

Defendant can make no such showing. Here, counsel elected to focus his arguments on a number of significant legal arguments, rather than attempting to challenge reasonable factual conclusions reached by this Court.[2] In particular, counsel raised a substantial legal challenge to the use of a protective sweep when it is not made incident to a lawful arrest. Counsel also challenged the sufficiency of the evidence of conspiracy and the use of a marijuana stalk, a substance not illegal to possess under Michigan law, as a major component of a finding of probable cause to search. Finally, counsel raised two challenges to the Court's sentencing determinations. All of the arguments raised by counsel were substantially stronger than the issues Defendant wished to raise. As a result, counsel's representation on appeal was not constitutionally ineffective.

---

[2] The Court notes that, in reviewing a ruling on a motion to suppress, the court of appeals will uphold a district court's factual findings unless they are clearly erroneous, but will conduct a *de novo* review of a district court's legal determinations. *See United States v. Navarro-Diaz*, 420 F.3d 581, 584 (6th Cir. 2005); *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005).

Moreover, inasmuch as the Sixth Circuit permitted Defendant to file a *pro se* supplemental brief on appeal and had before it all of the issues Defendant now raises, Defendant was not prejudiced by counsel's failure to raise the issues in the original brief on appeal. *Strickland*, 466 U.S. at 691.

Defendant also argues that counsel was ineffective for failing to argue before the Sixth Circuit the same issues counsel declined to raise in his brief. For the reasons this Court finds that counsel did not err in failing to raise the issues in his brief, he did not render ineffective assistance in failing to address the issues at oral argument.

Finally, Defendant asserts that appellate counsel was ineffective for failing to provide him timely notice of the Sixth Circuit's decision issued April 24, 2001. Defendant apparently did not receive a copy of the decision for more than a month after it was issued. While counsel may well have erred in failing to send a copy of the decision to Defendant, any error was not prejudicial. Upon motion by Defendant setting forth the reasons for his delay, the United States Supreme Court extended the time for filing a petition for writ of certiorari. Defendant timely filed his petition on September 12, 2001. Because Defendant was not prejudiced by counsel's inaction, he was not deprived of the right to the effective assistance of counsel. *See Strickland*, 466 U.S. at 691.

## V.

The files and records in this case conclusively show that the Defendant is entitled to no relief under § 2255. Accordingly no evidentiary hearing is required to resolve the merits

of the pending motion.  For the reasons stated herein, the motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 must be denied.  An order consistent with this opinion will be entered.


Date:    September 27, 2005            /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        CHIEF UNITED STATES DISTRICT JUDGE